Good morning, and may it please the Court, I'm James Laughlin, and I represent the appellant James Berry. With the Court's permission, I'd like to preserve three minutes of my time for rebuttal. You may do so, Counsel, just watch your call. Thank you. The counterfeiting case presents a few issues. First and foremost is the question of whether Mr. Berry's statements in the back of a patrol car were voluntary. In talking about that, I'd like to focus on Mr. Berry's confession to circuit service agent Warren that he actually helped to make counterfeit currency and knew that it was illegal, for that is the most damning evidence that he presented at his trial. By the time Mr. Berry made that confession, he had been held in the back of a patrol car with his hands cuffed behind his back for over four hours, and his repeated requests for drinking water and to use the restroom were ignored. What happened in the back of the patrol car is undisputed. It's all on tape, and the Court can hear for itself what was said and when. One of the first things Mr. Berry asked when agent Warren came out to talk to him was whether he could use the restroom. It's also one of the first things he asked Deputy Beedon Hall two and a half hours earlier when he came out to talk to him. Neither officer let him use the toilet. Also, two times in the half hour preceding agent Warren's questioning of Mr. Berry, he asked Deputy Hall for drinking water. He got nothing. And just about ten minutes before agent Warren came out, Mr. Berry, who again hid in the back of the patrol car with his hands cuffed behind his back, pleaded with Deputy Hall to loosen the cuffs, saying, Man, oh man, my wrists are so swollen. Again, he got no relief from his suffering. What he got was a visit from Secret Service agent Warren, who after denying Mr. Berry's request to use the restroom said, I already know what's going on here, and this is the only chance you're going to have to talk to me. By that point, Mr. Berry's thirst, the pain in his wrists, and his need to use the restroom, combined with the agent's threat to take his computers, combined to overcome his will and make a subsequent statement. What's your best case that you arguably can use to establish that this was an involuntary statement? Your Honor, honestly, I don't have a case that comes even close to this set of circumstances. What I have are the cases. Well, there are lots of cases out there where there are deprivations, for example, of using the restroom and that kind of thing, or duration of time in custody. There are. The cases I was able to find talked about that more in the absence. In finding statements voluntary, they say, Well, there's no evidence that he was denied water or use of the bathroom. I haven't found a voluntary case that talks about these kind of deprivations in the same set of circumstances. Well, if there's no U.S. Supreme Court, if there's no case law, what is it that you're – I mean, it's undeniably uncomfortable for Berry. I mean, I don't think anybody's going to quarrel with the notion that it was – that he was probably pretty uncomfortable. But as you follow the sequence of events, it also is kind of hard to see how his will was overborne. He was Mirandized twice. He thereafter did not ask for any accommodation. He talked. And sure, I guess he didn't want his computers taken because he knew what was on them. But, hey, that was just ordinary procedure. We're going to take your computer. And he says, hey, don't do that. There's stuff on there that – but then he proceeds to tell an exculpatory, put a spin on it that's in his favor. So it didn't – I mean, when you add it all up, where do you get the feeling that it was really involuntary? Well, Your Honor, in response to your question, I'd like to respond first to the first part of your question regarding my absence of authority. I do not have an absence of authority. I've cited several cases that talk about the various factors being significant factors in this kind of analysis. I've also cited in the reply brief to a Second Circuit case called Penkleff, which acknowledges them. Because all of these analysis involves the totality of circumstances, looking at other cases is rarely helpful, even in a case where you have similar circumstances. I agree. So putting that aside, then just where are you left with a feeling that this was all – this is just – the decision is totally wrong? Well, I think that if you listen to the tape and you hear the request that Mr. Berry made, the request that were ignored, and then view what was said to the officers in context, what you see is somebody who has a very weak will. He wants to talk to his girlfriend. He wants to, you know, something is – and I can see it in my briefs. Because he doesn't want her and his version to be inconsistent. Law enforcement can certainly say that. No, I'm not going to let you go back in the house to play with evidence like you were doing before we arrested you, to talk to your girlfriend and get your story straight. We've talked to her. Now we want to talk to you. And he says, yeah, okay, I'll talk. Right. And I wasn't suggesting the officers made any kind of inappropriate action in not letting him talk to her. What I'm saying is that he is not – Excuse me. What's our standard of review? It's a mixed question. It's factual findings are reviewed for clear error, but the ultimate question of voluntariness is a mixed question reviewed de novo. Going back to your honors question, I think that what you see is somebody who is going out of his way to be overly cooperative and helpful with the agents. It's clear he hesitates. He doesn't want to talk, but he goes to that next step. And I think you have to look at that in the context of these things he was struggling with in the four hours leading up to that point. I don't think we can minimize how severe it is for somebody who needs to go to the bathroom and is denied callously for four hours of that right. I don't think we can minimize how painful it is to be in the back of a police car with your arms cuffed behind your back and to ask the officers to undo the handcuffs or loosen them and get a callous comment like, oh, they're not too bad. But I still don't see the connection between that uncomfortableness and overcoming the voluntary nature of the statements because they didn't threaten him. They didn't say, okay, if you talk to us, we'll get you water. If you talk to us, we'll loosen the handcuffs. They didn't use the conditions in order to overcome his will. And, in fact, they did twice Mirandize him. So what is the, I mean, yes, it's awfully uncomfortable and probably painful, but what's the nexus between the lack of voluntariness? Well, I think this Court recognized in the Tingle case that, you know, some kind of overt threat or overt physical intimidation isn't required. What's the threat? What's the intimidation? It's not a threat or intimidation. What it is is putting Mr. Berry in an uncomfortable position over an extended period of time where it weakens him. I mean, to be under pain, I mean, we all know from, you know, stuff that's in the news about stress positions and alternative interrogations. It's not forcing him to stand for 12 hours. No, it isn't. But the acknowledgement in that kind of procedure is that subtle things like playing loud music or being in an uncomfortable position, things like that, can tend to weaken the will over time. And here we don't have those kinds of things, but we have pretty severe things. We have the denial of the fundamental right to use the restroom if you really need to use the restroom. We have the denial of drinking water, one of our basic needs. And, again, I think that the response by the officers that the handcuffs, you know, they're uncomfortable, they're not that bad, ignores that he was in this position for four hours. That's not the normal way that somebody is shackled, you know, when they're going on a brief trip to and from the police station. But that's a very painful position to be on for that length of time. And I think that if you're asking me whether there's some kind of golden moment where there's an obvious breakdown, no, there isn't. But I don't think that's the standard. I think that when the court set, when this court set in Tingle, that subtler methods can often operate more effectively to undermine somebody's will. These are exactly the kind of things he was talking about. These are the kind of things that wear somebody down. And as I pointed out in the briefs, the officer's intent isn't really relevant. But I find it hard to believe they didn't know what they were doing. I find it hard to believe that they waited until, you know, the time right after Mr. Berry says, you know, wow, my wrists are really swollen. I'm really thirsty. It's like, okay, okay, let's send Agent Warnock now. This is the kind of thing that softens a person up, so to speak, to make them more susceptible to police questioning when otherwise they may have said no. So I think that this kind of coercion, while subtle, is sufficient. Counsel, you may want to go on to the right to counsel issue or the motion to strike the computer agent's testimony. Very well, Your Honor. Let me talk briefly about the right to counsel issue. If the court doesn't suppress the statements as involuntary, a remand is really necessary for the district court to make an essential factual finding as to whether Mr. Berry invoked his right to counsel before he even got into the police car. The government doesn't dispute that if he did that, then the statements must be suppressed. There was directly conflicting testimony on that point. You had Mr. Berry and his girlfriend saying, yes, he invoked his right, and you had two officers saying no. Well, what was the testimony? Wasn't the testimony just that he said to his girlfriend, call my lawyer? The testimony isn't that he said to the police, I'm invoking my right to counsel, I want an attorney. That was his girlfriend's testimony. His own testimony was unequivocal, that I told Deputy Wyden Keller that I wanted an attorney. And I don't see those things being inconsistent. It's unclear as to whether his girlfriend was within earshot of that invocation, but the fact that it is significant is in the fact that since she heard that statement, which was made within the earshot of the officers, it supports his other statement that, yeah, I just told them that I wanted my right to counsel. And the officers contradict that. Yes. They say he never invoked in any way. Well, what's the point? Does it make a finding? No. I think through an oversight or for whatever reason, there's just no finding on that point, and contrary to what the government suggests, there's nothing that substitutes for a finding on that point. Well, isn't it implicit in the jury verdict? Excuse me? I'm sorry? Isn't this implicit in the jury finding, in the jury verdict? I don't think the jury's verdict is relevant because this is a question of a pretrial motion and whether the district judge made the determination as to whether the evidence presented at the pretrial event at your hearing was sufficient to show Mr. Berry invoking his right to counsel. That evidence in that issue wasn't at issue in trial at all. What I would suggest is that it's implicit in the district court's finding because the district court clearly knows the law, knows Edwards. So, for that matter, did the police officers, because the minute he actually did invoke his right to counsel, he stopped the questioning ASAP. So given the district court's findings and conclusions, isn't it implicit that he discounted Berry's credibility on it and went with the law enforcement officer's version? I don't think that this Court can say that. I think under United States v. Pripa Via, it sets the standard pretty firmly for what this Court should do in this kind of situation. It shouldn't try to guess at what the district court meant to, how it would have resolved the factual finding, nor can the court on its own look at the facts on the record and resolve the factual findings itself. The correct procedure, and the easiest one, is just to send it back to the district court and have them, have it decide in the first instance how to resolve the conflict. I see I'm out of time, so if I could reserve a minute. You certainly may. Thank you. May it please the Court. Ann Luotto-Wolf for the United States. The first issue I would like to address is defendant's claim that the district court erred in denying his motion to suppress his incriminating statements. The totality of the circumstances demonstrates that defendant was not coerced or induced into making inculpatory statements, that he spoke freely and voluntarily. The facts that we have here are a 40-year-old, intelligent, educated man who was He received his Miranda advisement before each of those interviews. He was not allowed to go back into the house, and he was not allowed to talk to his girlfriend. He was told that his computers were going to be seized, which was standard procedure. He sat with his hands cuffed behind his back, but not such as one of the cases cited by the defendant to a hitching post. He's sitting in a police car with his hands behind his back. He's not physically threatened. From the arrest to the end of the second interrogation, which was a period, I think, of approximately about four and a half hours, he doesn't use the bathroom after making two requests to do so. He made one to Deputy Wyden Keller and one to Special Agent Warren, and he doesn't have a drink of water. Notably, there is a deputy, Deputy Hall, who is with him. Outstanding. He's asking for both. That's true. He does ask for both. But, again, we have to look at the fact that there is an ongoing investigation, and it is not determinative of whether his will is overborne by the fact that his every request is not complied with. He is not begging. He is not pleading. He is not groaning. He is not moaning. There is a tape, a recorded tape of the entire duration, plus there is a deputy who is sitting in the car with him this entire period of time, and he does not make many of the requests that he makes. Most of them are not even directed toward the deputy who was with him for the entire period of time. He makes, as I said, two requests to use the restroom and no requests to Deputy Hall to use the restroom. He asks to have his handcuffs loosened the first time. There are two total requests. He asks the first time, right before the second interrogation, the handcuffs are then removed within a half an hour of that initial request. The second request, which the defense characterizes as begging or pleading, that occurs well over an hour after all questioning has ceased, and, again, there's that intervening point when the handcuffs are actually removed. So any discomfort he may have been feeling an hour after all questioning had ceased certainly is not relevant to the conditions he was under during the time that he made the statements. Can we go to the request for counsel? I mean, there's no question that a fact finding was not made. There is no. And there's not much question that it should have been made. I mean, it's required to be made. So in that circumstance, what is your view of what we should do? The government's view is that the finding, the general finding that the district court made, which was that the defendant was appropriately given and waived his Miranda rights and that he validly consented to speak with both Deputy Wyden Keller and Special Agent Warren, that he necessarily rejected the defendant's claim to have asked for a lawyer. Because if the district court had not rejected that, then the Miranda waiver clearly would not have been appropriate and the consent would not have been valid. By making those two specific findings, the court necessarily rejected the defendant's claim to have asked to speak to a lawyer inside the house before he was escorted outside. I understand what you're saying. But the reason we require findings is probably exemplified in this case because what we don't know from – we know from this record that the district court judge, who is a highly regarded, experienced judge, did make the finding of voluntariness and that after giving the two Miranda warnings, and when he made those findings and his voluntary consent was freely given, that's what he had in front of him. There was the tape. There was the transcript of the tape. But how do we know that he even considered whether the defendant invoked the rights of counsel at an earlier point if he doesn't tell us by making a finding? Well, the district court was clearly aware of it because at the time when the testimony was coming in, the district court was engaging in additional question and answer. So clearly the court was probing the facts. And then, again, in his oral pronouncement, this was not prepared. These were not written findings. The court did find, and it's a general finding, but the government submits that it's sufficient that the Miranda warnings were appropriate and that the consent was valid. But there is not stated on the record the specific finding that the defendant did not ask to speak to counsel before being escorted out. Really? It's pretty simple. He just could have said, I find that the officers are more credible on this point than the defendant. Yes. It certainly would have been simple. In analogous circumstances, we upon occasion will do an extremely limited remand to get the district judge to clarify its order. Is there any particular problem with doing that or do you see any need to do it? No. The government does not see a need to do it in this case, but a limited remand would not be terribly problematic. And you've agreed that we have to remand anyway to modify the conditions. Again, the government does not believe that that is necessary, that the conditions could be modified to conform the written judgment to the oral pronouncement. But again, the government does not object or oppose any limited remand for that limited purpose. Well, I think you said in your brief that the court should order a limited remand. Did you not? Perhaps that was overstating it. Well, I think what you're saying is we can do it. Yes. Or the district court can do it. Yes. And why bother the district court, which I agree with. But on the other hand, the district court can enter the order, too. The next issue that I would like to address, which appears to be the one of first impression in the court, is the defendant's claim that the testimony of Special Agent Beamer regarding the files he found in the defendant's computer was expert testimony. The district court properly determined in this particular case that Special Agent Beamer's testimony was not expert in nature. As found by the district court, the agent took what the district court deemed or found on the defendant's computer, and using forensic software that is utilized by the Secret Service, he told the jury what the files were that he found on the defendant's computer. He offered no opinion or interpretation of these materials. He simply identified what he found. And as Special Agent Beamer himself testified, it doesn't take an expert. It takes a computer forensic examiner, which is what he was trained to do. The Sixth Circuit opinion that is relied on by the defendant is really not in conflict with the government's position. All things being equal, the government believes that it would be appropriate in the right circumstances to follow the Sixth Circuit. However, as the Sixth Circuit recognized, the question of whether a computer examiner is testifying as an expert depends on the facts of the particular case. The testimony given by the computer expert in the Sixth Circuit opinion required his expertise to interpret the computerese in his report. And that is distinguishable from the testimony of Special Agent Beamer, which even a Luddite like myself could understand. Special Agent Beamer examined the software used by the, I mean, excuse me, he testified and explained that the software used by the Secret Service automatically browses the information on the replica of the hard drive that he had made, and then it produces a report, which was Exhibit 37, and is found at the excerpts of record at page 591. And then he testified about the commonly used Windows files and folders where the subject images were found, documents and settings, and then Jim. And again, referring to the excerpts of record found at 591, he testified that it was last accessed June 17th at 352, and any layperson looking at Exhibit 57 can see that that's exactly what it says. However, even if Special Agent Beamer testified as an expert, this Court can affirm the judgment on the basis that Special Agent Beamer was adequately qualified to testify to what he found on defendant's computer. There's no requirement that he be a, that he have a degree in computer science or have published articles, or that he have previously testified as an expert. As he himself stated, there is a first time for everything. He testified to his eight weeks of training in computer forensics by the Secret Service, his experience in computer forensics as an agent for the Secret Service, and that the software he used to conduct his analysis is the software used by the Secret Service. The challenges that were raised by the defendant go to the weight to give his testimony, not to its admissibility. And defendant's counsel fully exposed the rookie mistakes that he made on cross-examination, such as not actually turning on the computer to make sure that the clock on the computer was accurate, and that was the appropriate method for challenging his qualifications and his testimony. And then finally, any errors claimed by defendant, if they did occur, were harmless. There was ample other evidence to convict defendant of his possession of counterfeit currency. He was in his own house. It was occupied only by himself and his girlfriend, and occasionally by the co-defendant, Frost. The defendant was seated at the desk in front of the computer when the deputies arrived, and they saw him seated there. The computer with the counterfeit image was on the screen, which was illuminated, showing that it had been very recently used, and for hours his co-defendant, Frost, had been in custody. There was counterfeit scattered about the desk in the room, and there were genuine $100 on the scanner on the floor right next to where defendant was seated. He grabbed them off the scanner. They were the exact same images, the backside of which was on the screen and illuminated when the deputies arrived. And then finally, as if that wasn't enough, there was the counterfeit that was found inside the defendant's own wallet, which was in his back pocket. Consequently, the – again, if there were any errors that occurred, they were harmless because this was not a closed case. The evidence against the defendant was overwhelming. And unless the Court has further questions? Roberts. No questions. Thank you, counsel. Thank you. Mr. Laughlin, you have a little bit of reserved time. Thank you. I'd just like to address the Sixth Circuit's decision in Guinier and point out that it really is indistinguishable from this case, contrary to what the government says. Their expert, Secret Service agent Beamer, did exactly what the expert in Guinier did. He took specialized computer software, applied it to a hard drive, and then testified about what came out of the software. And despite the government's attempt to say, well, this program just prints out information anybody can understand, if the Court looks at the excess of record at page 591, it does say created modified access and gives a date. But then there's things like this MD5 and then a string of about 15 to 20 numbers. I have no idea what that means. I'm sure the counsel has no idea what that means. I have no idea what it means. I have to say that I would have to ‑‑ I'm not as computer literate as perhaps Judge Carter is, and you may think that that's not expert testimony, whereas I might have thought maybe it is because it's based on experience beyond what the ordinary layman would have and based on information beyond what one could rationally perceive. But the person who actually testified was and had in fact been trained as a computer forensics expert. So what is the harm here? What is the prejudice? Well, one, I disagree that the evidence shows that he was trained. We know he took some training courses, but we don't know what they were. We have no idea what his training was on this particular software. But, again, I suggest you only really get to that point if Rule 702 applies. And I think that even if in this case the Court decides that there's no ‑‑ that the error is harmless, I think it is worth giving some guidance on whether this kind of testimony does fall under Rule 702 because, as we know in this case, the government, you know, said, well, we're disclosing this, but we don't really have to. And I think there's other kind of things going on like that because of the uncertainty. And so that might be of some help. Roberts. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision. And we will hear next Barrientos v. 1801, 1825, Morton.
judges: O'scannlain, Rymer, Wardlaw